UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DES MOINES DIVISION

IN RE:

WENDEL RAY HOLLIDAY and                    Chapter 7
JANET MAY HOLLIDAY

    Debtors.                       Bankruptcy No. 03-00946

UNITED STATES OF AMERICA (FSA)

    Plaintiff

vs.                                        Adversary No. 05-30051-wle

WENDEL RAY HOLLIDAY and
JANET MAY HOLLIDAY

    Defendants.
_____

DOUGLAS WENDEL HOLLIDAY and                Chapter 7
JODIE ANN HOLLIDAY

    Debtors.                       Bankruptcy No. 03-00947

UNITED STATES OF AMERICA (FSA)

    Plaintiff

vs.                                        Adversary No. 05-30052-wle

DOUGLAS WENDEL HOLLIDAY and
JODIE ANN HOLLIDAY

    Defendants.


DECISION

    The United States of America (United States) asks that its claims against defendants be excepted from their discharges. Trial was held October 20 and 30-31, 2006 in Des Moines. These are core proceedings under 28 U.S.C. § 157(b)(2)(I).

    United States moved to consolidate the two proceedings. The court approved the consolidation for purposes of discovery and trial. Each proceeding, however, retained its separate identity.

The complaint against Wendel and Janet Holliday was filed on March 29, 2005; it contained eight counts.  During the course of these proceedings, United States dismissed all of its claims except those contained in Count I.

The complaint against Douglas and Jodie Holliday was filed on March 29, 2005; it contained 10 counts.  During the course of these proceedings, United States dismissed all of its claims except those contained in Count I.

The United States's Count I claims against Wendel and Janet Holliday and its Count I claims against Douglas and Jodie Holliday are nearly identical.  The counts allege that for crop years 1996 through 2004 some or all of the Hollidays obtained federal farm program benefits by fraudulent means.  The farm programs were administered by Farm Service Agency (FSA) for the Commodity Credit Corporation (CCC) of the United States Department of Agriculture (USDA).  The United States alleges that Hollidays obtained the benefits through "schemes and devices" which constitute fraud.  United States alleges it was damaged by the fraudulent schemes and devices, and that its claims should be excepted from each defendant's discharge.

Three claims are presented against each defendant in the now single count complaints.  One involves the eligibility of Jodie Holliday[1] to receive farm program benefits as a separate producer.  United States claims that Jodie and the others

---

[1] Hereafter, for simplicity, the court will respectfully refer to each defendant by his or her first name.  Collectively, they will be referred to as "defendants" or "Hollidays."

intentionally misrepresented Jodie's status as a person actively
engaged in farming in order to obtain separate-producer status
regarding farm program benefits.  United States alleges that the
misrepresentation caused it to pay Jodie benefits to which she
was not otherwise entitled.

Second, United States alleges that the defendants indirectly
received production flexibility contract payments in amounts
exceeding their direct payment limits, and that they did so by
participating in a scheme to have the contract payments made to
ineligible landlords.  The landlords allegedly agreed
concomitantly to reduce rent payments on the subject farm ground
leased to Hollidays.

Third, United States contends that Hollidays intentionally
filed false certifications and applications for loan deficiency
payments regarding their 2001 soybean crop.  As a result, they
were overpaid such benefits.

United States contends that the alleged actions of Hollidays
constitute "schemes or devices" within the meaning of 7 U.S.C. §
1308-2.  United States argues that the Secretary of Agriculture
has primary jurisdiction to determine if Hollidays "adopted a
scheme or device to evade, or that [had] the purpose of evading"
relevant portions of the Agricultural Adjustment Act.  Id.
United States asserts that the Secretary should be permitted to
make such a determination.  If the Secretary were to determine
that Hollidays had adopted a scheme or device, the Secretary
would then determine the amount of program benefits for which
Hollidays would have thus been ineligible and which they must

repay.  United States argues that it would then return to this
adversary proceeding for a decision on whether the claim for
repayment is excepted from discharge.


### A.  Jodie's Eligibility

United States claims that the Hollidays intentionally
misrepresented Jodie's farming activities in order to qualify her
as being separately eligible for farm program payments.  United
States says the misrepresentation took place from 2000 through
2002.

Douglas has been farming since the late 1970s.  He farms
with his father, Wendel, and his mother, Janet.  Douglas and
Jodie married on August 7, 1999.  On March 20, 2000, Jodie
submitted to FSA a form CCC-502A, seeking eligibility for the
benefits payable by the United States Department of Agriculture,
Commodity Credit Corporation (exhibit A, Bates stamp 80483-
80486).  She submitted a subsequent form CCC-502A to FSA on July
17, 2000 (exhibit A, Bates 80490-80497).  The forms were required
to be submitted annually and each time there was a major change
in the producer's operation.

Farm programs covered by her separate eligibility would
include payments under production flexibility contracts and loan
deficiency payments.  7 U.S.C. § 1308(1) and (2) (Agricultural
Adjustment Act, 2000).  To be eligible for payments under these
two programs, Jodie would have to be "actively engaged in
farming."  7 U.S.C. § 1308-1(b)(1).  An individual is considered
to be so engaged with respect to a farm operation if he or she

makes a significant contribution of capital, equipment, or land, <u>and</u> of personal labor or active personal management.  Also, the individual's share of the profits or losses from the operation must be commensurate with his or her contributions, and the contributions must be at risk.  7 U.S.C. § 1308-1(b)(2)(A)(i)-(iii).

Because Hollidays cash rented farm land, Jodie was also required to meet the "cash tenant" requirements of the statute. A person producing crops as a cash tenant, and who makes a significant contribution of active personal management, but not of personal labor, may only receive the farm program benefits with respect to the rented land if the person makes a significant contribution of equipment used in the operation.  7 U.S.C. § 1308(5)(D)(2000).[2]  A cash rent tenant must make a significant contribution of active personal labor <u>or</u> alternatively active personal management and equipment.  7 C.F.R. § 1400.401(a).

Jodie and Douglas began dating in 1997.  At the time, Jodie was employed by Farm Bureau Insurance in West Des Moines.  She commuted to her job from her home in Greenfield.  During the five and a half years of her employment with Farm Bureau, her duties involved human resources, switchboard operations, claims, and computer training.  While they were dating, Jodie began helping Douglas on the farms.  In 2000, Douglas, Wendel, and Janet were producing crops on more than 20,000 acres.  Prior to meeting Douglas, Jodie had no experience in farming.

---

[2] In 2002, the statute was amended to state the rule in § 1308(e)(4).

Jodie and Douglas married on August 7, 1999. She quit her job with Farm Bureau that month. From August 1999 to January 2001, Jodie had no off-the-farm employment. From January 2001 to November 2001, she was employed with Adair County Free Press, and from February 27, 2004 to the present, she has been employed by Madison County Farm Bureau.

She considers herself as engaged in farm operations, but she says she does not work in the fields. This was also her opinion during 2000-2002. During that period, she was obligated on farm loans and on land leases. She met with bankers approximately seven times on farm finances. She says she provided labor, such as hauling seed and fuel to the fields, taking lunches to farm workers, and picking up and delivering parts. She says Douglas handled most of the negotiations with third parties, and that Wendel ran machines and managed work crews. She testified that she did "bookwork," such as creating spread sheets, and entering farm data on the computer. She says Janet did the accounting and maintained the records.

She testified that she was involved in farm management "behind the scenes." She concedes that although she was learning, she was still involved. She said she helped with the decisions on purchasing seed, herbicide, and fertilizer. She participated in decisions on marketing grain. She had contact with insurance agents on crop insurance. Most of the management decisions were made by Douglas and Wendel.

On her form CCC-502A, submitted March 20, 2000, Jodie described the farms she owned and leased, her ownership interests

in equipment, and her labor and management activities.  As to
labor, she stated that she provided 2,500 hours of active
personal labor (exhibit A, Bates 80485).  As to management
activities, she estimated that she provided 100 per cent of her
share.  Presumably her share was 25 per cent of the joint
operation (exhibit A, Bates 80485).  She referred to page 4,
section 2B 1-8 for the types of management duties she performed.
However, exhibit A did not include such a list.  Neither did a
nearly duplicate exhibit C (Bates 80483-80488).

Jodie certified that the information was true and correct
(exhibit A, Bates 80485).  The exhibit C version of the form
contained the determination of the FSA as to whether she was a
"person" who was "actively engaged in farming" for purposes of
farm program eligibility.  The decision maker, Allen Steward,
determined that based on the information submitted, she was
actively engaged in farming, and was considered a "person" for
payment limitation purposes (exhibit C, Bates 80488).  Steward
stated the determining factors: "[P]roducer is considered
actively engaged in farming by virtue of significant contribution
of land rented, capital, labor & management." (Id.)  In making
the determination, FSA did not independently verify Jodie's
information, but relied on her statements.  On March 29, 2000,
the FSA Adair County Executive Director, Daniel F. Wells,
confirmed the determination by letter (exhibit C, Bates 80489).

Jodie submitted a second form CCC-502A for the 2000 crop
year on July 17, 2000 (exhibit A, Bates 80490-80497).  She
indicated she provided 100 per cent of her share of the capital

7

and was an owner of equipment.  She estimated her hours of labor

at 1,500 hours; she estimated that she provided 100 per cent of

her share of the active personal management.  For the description

of her management activities, she referred to page 4, section 2B

of the form.  That page was part of the form (exhibit A, Bates

80493).  Section 2B defined "active personal management" and

listed the following activities:

(1) Supervision of activities necessary in the farming
operation, including activities involved in land preparation,
planting, cultivating, harvesting, and marketing agricultural
commodities, as well as activities required to establish and
maintain conserving cover crops or conserving use acreage and
activities required in livestock operations.

(2) Business-related actions which include discretionary
decision making;

(3) Evaluation of financial condition and needs of the
farming operation;

(4) Assistance in the structuring or preparation of
financial reports or analyses for the farming operation;

(5) Consultations in or structuring of business-related
financing arrangements for the farming operation;

(6) Marketing and promotion of agricultural commodities
produced by the farming operation;

(7) Acquiring technical information used in the farming
operation; or

(8) Any other management function reasonably necessary to
conduct the farming operation and for which service the operation
would ordinarily be charged a fee.

(Exhibit A, Bates 80493.)  Thus Jodie adopted the definitions to

describe her management activities.  On the exhibit C version of

the July 17, 2000 form, there were attached two additional pages

showing the county committee's determination that Jodie was

actively engaged in farming (exhibit C, Bates 80498-99).  Section

8

7.C of the determination indicated as the determinative factors
that Jodie provided significant contribution of rented land,
capital, equipment, active personal labor, and active personal
management. (Id. at 80499)  On August 3, 2000, the FSA Adair
County Executive Director, Daniel F. Wells, confirmed the
determination by letter (exhibit C, Bates 80500).

Approval of Jodie's separate status in 2000 made her
eligible for production flexibility contract payments of up to
$40,000.00 per fiscal year and for loan deficiency payments of up
to $75,000.00 per crop year.  In 2000, she received the maximum
payments under these two programs.

In 2001, FSA conducted a year-end review of Hollidays'
eligibility.  Such reviews are performed either because of
concerns over eligibility or as a random spot check.  Wells, the
Adair County FSA Director, said that Hollidays were chosen for a
review because Hollidays had reached the maximum on program
payments limitations, and because Jodie had not been engaged in
farming before she married Douglas.  She had married, certified
herself as to her farming operation, and then immediately reached
the maximum individual payments on the relevant programs.

At the request of Adair County FSA, a review team was
selected by Roberta A. Schaaf, the FSA Regional Director.  In
January 2001, Schaaf appointed a three-person review team which
included herself and two district directors--Tom Vanderzyl and
Jolene Gechter.

FSA notified Hollidays of the decision to review on February
23, 2001.  During the process of review, a team might request

documentation from the farmer to support the information provided
in the 502 form.  The team reviews the information provided by
the farmer, compares it to the information on the 502 forms, and
if it has concerns, it may ask for additional information.  The
team would review documents such as tax returns, crop-inputs
invoices, crop sales documents, and fertilizer application
records.  The team may also request interviews.

During the process, Hollidays filed a joint-operation form
502B (exhibit C, Bates 80448-80462).  Each Holliday indicated a
25 per cent share of the joint operation.  Each Holliday reported
contributing 25 per cent of the capital and land for the
operation (exhibit C, Bates 80449), and Jodie and Douglas each
reported owning 24 per cent of the equipment used in the
operation.  Wendel and Janet each reported ownership of 26 per
cent of such equipment.  The Hollidays reported hiring 75 per
cent of the labor for the farming operation.  Of the remaining 25
per cent, Jodie reported she contributed five per cent of active
personal labor.  As to management, each Holliday, including
Jodie, reported contributing 25 per cent of the active personal
management. (Id.)  Attached as part of the exhibits were four
printed sheets showing each Holliday's "farm operation
contributions" (exhibit C, Bates 80455-80458).

This list of contributions by Jodie stated the following:

   * Received all E-mail as to marketing and advertising.
   * Compiled data for harvesting load sheets, crop
      insurance, etc.
   * Participated in compiling information to receive loans.
   * Met with loan officers.
   * Input on decision making.
   * Mowing and keeping farm clean.

      * Received information from phone calls.
      * Help deliver seed to field.
      * Help move equipment.
      * Deliver fuel to fields.
      * Deliver meals to hired help.
      * Picking up parts at various implement dealers.

(Exhibit C, Bates 80456.)

The review team requested that Hollidays submit documents in support of their statuses.  The Hollidays provided the documents by March 23, 2001, and these were reviewed by the team.  The team uses a checklist and worksheets in its review.  As to Jodie, see exhibit E, Bates 2648-2695.  The checklist noted that the "[d]ocumentation provided by [Jodie] was very thorough and clearly showed that 'asset' and 'personal' contribution requirements were met."  (Id. at Bates 2649.)  Schaaf testified that because of the documentation provided, personal interviews of the Hollidays were not required.  The type of documents provided and reviewed were described in a review checklist (exhibit E, Bates 2693-2695).

Part of the review was to determine whether Jodie's contributions were commensurate with her claimed share of profits and losses and whether her contributions were at risk.  The checklist indicated that they were, with the following justification: "Documentation proved that the producer had provided capital, land, equipment, labor and management contributions that were within reason on their [sic] claimed share." (Exhibit E, Bates 2652.)

Notwithstanding the foregoing assertion, review team worksheets showed that although capital was considered to be a

significant contribution by Jodie (exhibit E, Bates 2654), her contributions of equipment and land were not considered significant (exhibit E, Bates 2659, 2665).  Also, no combination of capital, equipment, and land was considered as a significant contribution by Jodie, at least as shown by the team's Worksheet 4 (exhibit E, Bates 2674).

The worksheets from the review showed that active personal management was not used as a significant contribution by Jodie (exhibit E, Bates 2680), and that a combination of active personal labor and active personal management was not used (exhibit E, Bates 2683).  Worksheet 5 showed that active personal labor by Jodie was used as a significant contribution (exhibit E, Bates 2676).  The review team recognized that there was no record of hours worked by Jodie (id.), but in determining whether Jodie could have provided the labor reported on form CCC-502, it chose not to interview her, and instead justified its finding as follows: "County employee knowledge indicates active personal labor by the producer." (Exhibit E, Bates 2678.)  The worksheet stated also that "[b]ased on knowledge of County Office employees in the various Counties where this person operates, it was clear to the reviewing authority that a significant contribution of labor was made" and that the "[i]ndividual does provide active personal labor." (Exhibit E, Bates 2679.)

Because a substantial part of the farming operation took place on leased land, Hollidays were required to comply with the "cash tenant rule."  See 7 U.S.C. § 1308(e)(4).  Under the regulations, a cash rent tenant is not eligible for program

benefits unless the tenant makes either a significant contribution of active personal labor <u>or</u> alternatively a significant contribution of active personal management and equipment.  The review team found that Jodie was a cash rent tenant and that she provided a contribution of active personal labor.  It summarized its findings as follows: "[E]vidence provided, coupled with personal knowledge of the County Office staff about labor and management contributions made by [Jodie], support finding that cash rent tenant rules have been met." (Exhibit E, Bates 2673.)

In summarizing its findings, the team determined that Jodie did not make a significant contribution of land, equipment, or active personal management.  Moreover, it determined that she did not make a significant "right-hand" contribution (a combination of labor and management) or a significant "left-hand" contribution (a combination of land, capital, and equipment).  It appeared to find that Jodie was "actively engaged in farming" based on her contribution of capital and active personal labor. The team found her contribution commensurate and at risk (exhibit E, Bates 2691-2692).

On August 8, 2001, Daniel Wells, the Adair County Executive Director for FSA, notified the Hollidays by letter that all four were found to be actively engaged in farming for purposes of payment limitation purposes (exhibit C, Bates 80463-80464).

Hollidays submitted a similar form CCC-502B for the 2002 program year (exhibit C, Bates 80432-80445).  It was executed by Douglas for all Hollidays.  It contained the same listing for

Jodie's contributions.  The committee determined that, based on the information provided, each Holliday was considered a separate person for payment limitations (id. at Bates 80445).

Schaaf testified that with regard to the activities Jodie listed on her 502 forms, the committee did not separately verify any activities.  So far as management activities were concerned, the most significant on the list were Jodie's alleged "participat[ion] in compiling information to receive loans, [meeting] with loan officers," and providing "input on decision making."  There is no indication from the worksheets and summary that the team made a finding that Jodie provided a significant contribution of personal management; in fact, the finding was to the contrary (exhibit E, Bates 2680).

As to active personal labor, Schaaf testified that so far as Jodie's listed contributions were concerned, none of the following would have been sufficient by itself to qualify as a significant contribution either to labor or to management: data entry, driving a pickup truck, delivering equipment parts, attending meetings and asking questions, delivering meals to farmhands, and mowing and keeping the farm clean.  Schaaf said it was a very close call as to whether moving equipment, and delivering seed and fuel to the fields would qualify a person to be actively engaged in farming.  She said the team looked at a combination of everything listed in making its decision.  The team could consider a combination of active personal labor and active personal management, when neither independently met the requirements of the statute and Code of Federal Regulations.  7

C.F.R. § 1400.3, "Significant contribution" at ¶ (4)(2000).

Although worksheets 7 and 20 indicate that the team did not combine active labor and management, Schaaf's testimony was that the team did so.

FSA now disputes the truth of the contributions that Jodie listed on her certified 502 forms.  The trigger for the dispute took place during July 2006 when Daniel Wells, for the FSA, attended trial of a state court civil suit brought by First National Bank of Creston against Hollidays.  He said that during Jodie's testimony, she was asked if she were a farmer, and she responded: "I am not a farmer.  I have never farmed, and I have never considered myself a farmer."  Jodie's explanation for her testimony is that she does not consider herself a "farmer" in the traditional sense--that she cultivates, and plants, tends, and harvests crops.  She admits she did no field work.  The closest to field work was perhaps helping to load corn planters with seed.

I find her explanation credible, and do not find that her state court trial testimony discredited her certified statements to the FSA.  During 2000 to 2002, the Code of Federal Regulations defined "active personal labor" as "personally providing physical activities necessary in a farming operation."  7 C.F.R. § 1400.3(b).  It does not appear to limit the definition to field work.  Moreover, the testimony related by Wells did not provide the context of the question.  I would agree with Jodie's contention that one might legally be a "farmer" for purposes of farm programs without being a farmer in the traditional sense of

15

being one who cultivates, plants, tends and harvests.  This might be particularly so in joint operations where there is division of labor.

Wells testified that he rarely saw or talked to Jodie, whether at the FSA office or on his trips to Holliday farm sites. He said he never saw her working in the fields.

Steven L. Meyer sold crop insurance to Hollidays in 2000. He dealt with Jodie with regard to crop records, and he corroborated her preparation of loan reports on crops.  He met with Hollidays regarding crop insurance and crop marketing in approximately 2000.  He said Jodie was present at all five or six meetings.  He added that he believed she had influence on the other Hollidays as to marketing strategies.  He testified also to having seen Jodie move machinery and take meals to field workers.

Jerry Murphy was employed by a business known as DTN Ag One in 2000.  He met with Hollidays several times in an effort to obtain financing for them.  He said Jodie attended approximately six meetings.  He said Jodie actively participated in the meetings, mostly with questions.

Leroy Killion was employed by the Hollidays as a farm worker from 1995 through February 2003.  He ran a planter, other machinery, and he worked at their bin site.  He also applied some chemicals to fields.  He said that after 1999 he saw Jodie at the farms for about six months.  He testified that she would transport farm hands.  He did not observe her hauling fuel, seed or meals.  He never saw her move equipment.

United States claims that Hollidays fraudulently represented

to FSA that Jodie was actively engaged in farming, and that they specified operational contributions for Jodie that were false. United States claims it was damaged by the misrepresentation by providing farm program benefits to Jodie as a separate producer.

Jodie certified her management and labor contributions on March 20, 2000 (exhibit C, Bates 80485) and on July 17, 2000 (exhibit C, Bates 80492).  On July 30, 2001, all Hollidays submitted a form CCC-502B setting out Jodie's management and labor contributions for the 2001 program year (exhibit C, Bates 80448-80462).  On July 11, 2002, all Hollidays submitted a form CCC-502B setting out Jodie's same contributions for management and labor for the 2002 program year (exhibit C, Bates 80432-80445).

For the 2001 and 2002 program years, the forms were signed by Douglas for all Hollidays, pursuant to powers of attorney. United States contends that any fraud in the submission of the forms is imputable to Jodie, Wendel, and Janet.  Fraud is imputable from agent to principal, for purposes of § 523(a)(2)(A), if the principal knew or should have known of the fraud.  <u>Walker v. Citizens State Bank of Maryville, Missouri (Matter of Walker)</u>, 726 F.2d 452, 454 (8th Cir. 1984).

To prevail under 11 U.S.C. § 523(a)(2)(A), United States must prove by a preponderance of the evidence as to each debtor, that each (1) made a false representation; (2) at the time, debtor knew the representation was false; (3) the representation was made deliberately and with the intent and purpose to deceive United States; (4) the creditor justifiably relied on the

representation; (5) the United States sustained loss and damage as a proximate result of the representation having been made. Lindau v. Nelson (In re Nelson), 357 B.R. 508, 513 (B.A.P. 8th Cir. 2006). Regarding the 2001 and 2002 program years, as to Wendel, Janet, and Jodie, United States must show that they knew or should have known of the alleged fraud.

The allegation of fraud as to Jodie's contributions to the operation relate to her management and labor activities. On March 23, 2000, she certified an estimated 2500 hours of labor, and on July 17, 2000, she certified 1500 hours of labor for "program year" 2000 (exhibit A, Bates 80483-85, 80490-92). The regulations governing farm program payment limitation and payment eligibility make reference to hours of labor per calendar year. 7 C.F.R. § 1400.3(b) ("Significant contribution," ¶ (2)(i) and "Substantial amount of active personal labor," ¶ (1)).

For 2000, Jodie could have satisfied the minimum for significant contribution of labor with 1,000 hours of labor for the crop year or calendar year. I conclude that United States has failed to show by a preponderance of the evidence that Jodie materially misrepresented her hours of active personal labor for 2000. It has not proven that her representations were false.

The Hollidays' 2001 submission was made during the year-end review (exhibit C, Bates 80448-80462). The crux of the dispute is whether Jodie misrepresented her activities on her listing of operational contributions (id. at Bates 80456).

As to management activities, Jodie listed five: (1) received all E-mail as to marketing and advertising, (2) compiled data for

18

harvesting load sheets, crop insurance, etc., (3) participated in compiling information to receive loans, (4) met with loan officers, and (5) input on decision making.  According to Schaaf, (3), (4) and (5) were crucial to finding active personal management, defined as "activities that are critical to the profitability of the farming operation."  7 C.F.R. 1400.3(b) ("Significant contribution" at ¶ (3)).

There is no evidence that Jodie did not carry out these activities.  There is evidence she met with loan officers, that she gave her opinions as to marketing and insurance, and that she gave input on decisions, even though it appears Douglas or Douglas and Wendel made most of the decisions.

Each activity as to labor and management was listed generally, and without much detail or explanation.  There was no estimate of time spent for any activity.

Schaaf testified that deliveries of parts and meals and mowing and cleaning were insufficient, in themselves, to satisfy the requirement of substantial active personal labor.  As to delivering seed, moving equipment and delivering fuel, Schaaf said they qualified as labor, but it was a "close call" whether a person doing only those activities could satisfy the labor requirement.

I conclude that United States has failed to prove by a preponderance of the evidence that Hollidays' claim as to any of Jodie's listed activities was false.  It seems more to the point that the amount of time spent on each activity is disputed.  However, the list did not say how much time she spent on each,

19

and FSA did not ask her or the other Hollidays.  FSA was the
decision maker on Jodie's application.  It was enforcing the
statute and the regulations.  It had operations manuals to guide
it.  As shown by Schaaf's testimony, the FSA review team knew
which listed activities were critical, and which were tenuous
supports at best.  It appears that the time spent by Jodie on the
listed activities was critical.  Yet the form did not quantify
hours spent on each activity, and FSA made no attempt to get more
information, either by interviewing Jodie or others, or by
requesting more written support.  FSA did not require more
support to show that the amount of time spent on each activity
made the contribution "significant" as required in the
regulations (7 C.F.R. § 1400.202).  Nonetheless, FSA now attempts
to show that the necessary management and labor activities were
not performed at all.  This it has not done.

Moreover, because of the inadequate showing by Jodie or the
other Hollidays of how much time Jodie spent on the activities,
FSA likely relied on the personal knowledge of county office
staff members regarding the significance of her management and
labor contributions.  The importance of this support was
indicated on the labor and cash-rent tenant worksheets (exhibit
E, Worksheet 5, Bates 2678; Worksheet 3.5, Bates 2673).

To the extent the FSA would claim it relied on an
implication that Jodie spent significant time on the items in the
list, I find the FSA did not justifiably rely on any such implied
fact.  The FSA knew the requirements and what might be needed to
satisfy them.  Jodie's general list of activities, without

quantification of time spent on any activity, was not a
justifiable basis for concluding that she spent a significant
amount of time or that she performed management activities to the
extent necessary to make them critical to the operation of the
farm.  On its face, Jodie's list was not a justifiable basis for
the FSA's reliance.  This was especially so given FSA's concern
over whether a person with no farming background could satisfy
the requirement so quickly after marriage to a farmer.

### B. Soybean Certifications and LDPs

FSA's second claim is that Hollidays intentionally
misrepresented the amount of 2001 soybeans on hand in order to
obtain greater loan deficiency payments.  United States contends
that it was induced by the misrepresentations into giving
Hollidays loan deficiency payments on 55,094.26 bushels of beans
which Hollidays did not have.  To the extent United States was
damaged by any misrepresentation, 7 C.F.R. § 1421.203(b) provides
for assessment of liquidated damages against producers who did
not act in good faith.

On November 12, 2001, Douglas, for himself and the other
Hollidays, made application for loan deficiency payments (LDP) on
Hollidays' 2001 soybean crop.  The application certified to CCC
that Hollidays had 350,000 bushels of 2001 beans (exhibit I,
Bates 801994).  Each Holliday claimed 25 per cent of the stored
beans.  In reliance on the certification, the FSA for CCC paid
Hollidays $1.22 per bushel for a total LDP of $427,000.00. (Id.)

On April 25, 2002, FSA performed a measurement service at

21

the storage location.  The inspector estimated that there were 322,995 bushels at the storage location.

On May 15, 2002, each Holliday, by Douglas, again through the powers of attorney, applied for additional LDP for 2001 beans.  Douglas and Jodie each certified having 8,229 bushels of beans.  Wendel and Janet each certified to having 8,228 bushels of beans.  The location for all the beans was described as "section 7 Highland Big Building." (Exhibit I, Bates 801916, 801899, 801882, and 801867.)  The LDP rate was 75 cents per bushel.  Relying on the certifications, CCC paid Jodie and Douglas each $6,171.75 and paid Wendel and Janet each $6,171.00.

Thus Hollidays certified to CCC possession of a total of 382,914 bushels of 2001 soybeans, for which they received aggregate LDP of $451,685.50 (exhibit I, Bates 801986, 801913, 801896, 801879, and 801864).  United States contends that Hollidays can account for the sales of only 327,819.74 bushels, leaving a shortage of 55,094.26 bushels (exhibit F).

Thus, United States seeks to prove false certifications by comparing the certifications to Hollidays' sales records. Hollidays counter this proof by pointing to early sales, and adding them to a later measurement by FSA.

Hollidays respond that when the measurement was conducted on April 25, 2002, they had already sold 59,919.44 bushels of 2001 beans through a sales entity owned by them--ABC Grain, LLC.  They argue that those sales plus the measurement total 382,914.44 bushels, almost exactly the amount of the certified bushels.

The certification submitted by Hollidays acknowledged their

understanding that "any false claim or false statement may lead to civil liability or criminal prosecution," that CCC might require copies of sales contracts for the covered production, and that "CCC shall assess liquidated damages in accordance with 7 C.F.R. Part 1421, as applicable, if the producer misrepresented the eligible commodity indicated...." (Exhibit I, Bates 801994.)

On March 7, 2002, FSA contacted Hollidays by letter, announcing that LDP No. 1753 had been selected for a spot check (exhibit 1). This regarded the LDP on the 350,000 bushels. The letter stated that Hollidays must take certain actions. If Hollidays still had the beans, they could authorize a measurement service and use it as final production evidence. If this route were chosen, Hollidays would have to make the request within seven days from the date of the letter (March 7). Alternatively, Hollidays could provide production evidence by the earlier of 15 days after the sale of the beans or the end of the ninth month after the LDP disbursement (November 20, 2001). If any grain had already been marketed, Hollidays would be required to provide FSA with production evidence within 15 days of the date of the letter. Production evidence could include "settlement sheets, load summary sheets, etc." The letter warned that failure to provide acceptable production evidence may result in repayment of the entire LDP amount (id.).

The measurement service which took place on April 25, 2002, may have been in response to FSA's letter. Exhibit 1, Bates 801942 is entitled "COC Brief." The brief documented the situation regarding the Hollidays' LDP #1753. It stated as

follows:

> The producer provided evidence for 2001 LDP # 1753,
> this LDP was selected for spotcheck.  The producer
> provided production evidence in the name of ABC Grain.
> We requested that the producer provide information as
> to what producers make up ABC Grain LLC.  Producers
> making up ABC Grain are Douglas Holliday, Jodie
> Holliday, Wendel Holliday and Janet Holliday.  The COC
> must determine if the production evidence submitted is
> eligible.

(Id.)  The COC[3] decision was noted on the same form.  It was that

"Production evidence provided is acceptable."  The decision was

recorded in the minutes of the COC dated June 25, 2003.  It was

noted as approved.

According to Dan Wells of the FSA, the evidence, given at

the time of the spot check regarding the sales by ABC Grain,

showed sales of 59,919 bushels.  This corresponds to the evidence

introduced at trial.  The evidence showed bean sales to Growmark,

Inc. in the aggregate amount of 9,550.78 bushels from February 28

through March 5, 2002, and bean sales to The Scoular Company in

the aggregate amount of 50,368.66 bushels on February 11, 2002.

The Growmark and Scoular sales took place before the

measurement service check on April 25, 2002.  To the extent the

measurement could be used as "final production evidence," it

would have shown the existence of 322,995 bushels measured after

the Growmark and Scoular sales.  The Growmark and Scoular sales

added to the measurement show 382,914 bushels.  At the time

Hollidays had certified production and possession of 350,000

bushels.

---

[3] "COC" was not defined in the brief itself.  It may mean
"County Committee," but the court is not sure.

After the early sales and the measurements, Hollidays applied for LDP on 32,914 bushels of 2001 beans.  They were paid an LDP of 75 cents per bushel or $24,685.50 based on the application and certification.  Thus Hollidays are relying on the pre-measurement sales and the measurement to show Hollidays certified accurate bean production.  They say they certified 382,914 bushels and proved by the ABC Grain sales and the measurement that they produced 382,914 bushels.

United States contends, however, that all settlement sheets show sales of only 327,819.74, a shortage of 55,094.26 bushels. The United States refers to exhibits G and H, which include the ABC Grain sales to Scoular and Growmark and also Hollidays' sales of beans to Cargill.  Exhibit G shows sales by Douglas and Jodie of 134,633.40 bushels to Cargill from October 30, 2002 to November 13, 2002.  Exhibit H shows sales of 133,266.90 bushels to Cargill by Wendel and Janet on October 29 and 30, 2002. According to these exhibits and the evidence of earlier sales of 59,919.44 bushels, sales of 2001 beans for all Hollidays total 327,819.74 bushels.

In their post-trial brief, Hollidays respond to the United States's argument by contending that the government "edited the production evidence provided by the Hollidays for 2001 soybeans to make it appear confusing.  Conspicuous by their absence from any of the government's exhibits are substantial amounts of the production evidence provided by Hollidays."  (Brief, doc. 76, p. 15.)  Hollidays do not point out in their documentary evidence what additional sales records should be considered.

United States contends that Hollidays fraudulently misrepresented the amount of beans produced in 2001 to obtain greater LDPs.  I conclude that United States has failed to prove a fraudulent representation.

It occurs to the court that the evidence and the law may support the position that the United States is estopped from claiming it has been defrauded as a result of an alleged shortage in 2001 beans.  On June 25, 2003, FSA determined that the production evidence of ABC Grain sales was acceptable.  That evidence showed sales of 59,919 bushels prior to the FSA measurement.  FSA's letter announcing the spot check gave Hollidays the option of obtaining an FSA measurement of the beans and of using it as "final production evidence" (exhibit 1).  The measurement showed 322,995 bushels of beans.  The measured beans and prior sales total 382,914 bushels, more than enough to cover the amount certified at that time, 350,000 bushels.  Perhaps based on that figure, Hollidays applied for more LDPs and received payment based on an additional 32,914 bushels.  It may be that United States should be estopped from now claiming that the test of a shortage in production is the actual later sales or settlement sheets.  Because I find the United States has otherwise failed to prove fraud, I do not reach an estoppel issue.

The evidence of sales (exhibits G and H) shows a sales shortage of 55,094.26 based on certified bushels of 382,914.  I will assume for the sake of argument that United States may rely on the shortage to show fraud notwithstanding the measurement and

its acceptance of the proofs of prior sales.

What are possible explanations for the shortfall?  One possibility is that the debtors misrepresented the true ownership of some of the beans when FSA conducted the measurement, but that those beans were not sold by Hollidays.  There is no proof of such a misrepresentation.

Another possibility is that there are missing sales records, and the actual sales approximately equal the numbers of beans certified.  Hollidays allege records are missing from exhibits G and H, but they did not produce them or describe the missing sales.

Perhaps the contents of the bins were measured incorrectly. If the measurement was greater than the actual amount of beans, it would reduce *pro tanto* the shortage in sales, but it might increase the amount Hollidays were overpaid in LDPs.  An incorrect measurement by FSA, however, would negate fraud by Hollidays.  Nonetheless, neither party has shown that the beans were incorrectly measured.

Another possibility is that Hollidays produced 382,914 bushels of beans, and that they converted 55,094 bushels, with the converted beans not showing up in reported sales.  The United States's claim, however, is for fraud regarding the certification not for conversion.

The United States has failed to prove that Hollidays misrepresented the amount of 2001 soybeans on hand in their applications and certifications for LDPs.

### C. Production Flexibility Contracts

United States's remaining claim is that Hollidays conspired with certain landlords to circumvent the aggregate limits on payments to individual producers on production flexibility contracts (PFCs).  The PFC program was instituted in 1996 under the Agricultural Market Transition Act.  7 U.S.C. § 7201, *et seq.* Under the program, the Secretary of Agriculture enters into contracts with producers "who share in the risk of producing a crop" and who are "entitled to share in the crop available."  7 U.S.C. § 7202(12).  Non-producer owners are not eligible.  See 7 U.S.C. § 7211(b).  Payments are made to producers for the contract acres by a determined rate for a particular crop.

Payments to producers are restricted to the limits provided under 7 U.S.C. § 1308(1).  The total payments to a producer under one or more PFCs during any fiscal year may not exceed $40,000.00.  7 U.S.C. § 1308(1).  Payments made to producers under the contracts are subsidies, not loans.  The program was in effect from 1996 to 2002.  Douglas, Wendel, and Janet each reached the maximum PFC payment limitation from 1998 through 2002.  Jodie reached the limitation each year from 2000 through 2002.

### 1.  Damewood Farms

The first farm alleged to be the subject of PFC fraud was owned by Dorothy Damewood, an elderly woman living in Illinois. Damewood's farms in Iowa were managed by Junior P. Huls who held power of attorney.  On December 9, 1997, Huls entered into a PFC with CCC on Damewood's farm number 1907, for the 1998 crop year

(exhibit M-31).  Damewood was represented to be the owner/ producer.  CCC accepted the contract on December 16, 1997. Damewood was paid $3,548.00 as the payment under the PFC.  It appears that Wendel, Janet and Douglas Holliday signed a form at CCC in July 1998 in order to succeed Damewood as record producers on farm 1907 (exhibit M-32).

For 1998, Damewood entered into two farm leases with Wendel, Janet, and Douglas (exhibits M-14 and M-13).  All tracts covered by the two leases were in Union County.  According to Douglas's testimony, lease M-14 was for ground identified as farm 1907 by CCC.  This was also known as the "Martin farm."  As to lease M-14, 309.3 acres were leased for $127.00 per acre.  The total lease payment for farm 1907 was $39,281.10.  As to the other farm (M-13, the "Conover farm"), 172.6 acres were leased for $125.00 per acre.

As to the 172.6 acres represented by exhibit M-13, Conover farm, there were successive leases for 1998-1999 (M-13), for 1999-2000 (M-16), for 2000-2001 (M-19), for 2001-2002 (M-21), and 2002-2003 (M-22).  Each year the per acre rental was $125.00 except for 2001-2002, when it dropped to $96.93 per acre.

Wendel, Janet, and Douglas rented the "Martin farm" from 1998 through February 2003.  The evidence shows five successive leases: for 1998-1999 (M-14); for 1999-2000 (M-15); 2000-2001 (M-17); 2001-2002 (M-20) and from 2002-2003 (M-24).  It appears the Martin farm was rented by the tillable acre (309.3 acres).  The rate was $127.00 per year for each lease except 2001-2002, when the rate was $96.93.

For crop years 2000 and 2002, Wendel, Janet, and Douglas rented a third parcel of land containing 240.3 acres from Damewood. There were two leases for it (M-18 and M-23). The first year Damewood leased the land to Hollidays for $125.00 per acre, and the second year for $96.93.

On each of the three series of leases on the same ground, the rent dropped for one year, in each case to $96.93 per acre. For the Martin farm (farm 1907) the one-year savings for Hollidays was $9,300.65, for the Conover farm the one-year savings was $4,844.88, and for the third farm of 240.3 acres, the one-year savings was $6,745.22. None of the figures match the PFC payment ($3,548.00) received by Damewood in 1998.

The fraud theory of the United States is that because each Holliday had reached his or her limit as to aggregate PFC payments, Hollidays could not apply for such payments on the farms rented to them by Damewood. An owner who is also a producer can qualify for PFC payments, but not if the owner intends only to obtain cash rent. An owner may sign a PFC for a farm, intending to farm, then change his or her mind, and rent the land to another. If the owner has received the PFC payment, he or she may retain it, but the tenant would not be eligible for PFC payments on the land, even if the tenant had not yet reached his aggregate cap figure for such benefits. The tenant/producer would sign documents with CCC to succeed the landlord as producer for other programs, but not for the PFC. Roberta Schaaf, district director for FSA, testified that at that point there would be nothing inherently wrong with the tenant negotiating a

reduction of rent because the landlord had received the PFC payment.

United States contends that after the landlords had agreed to rent to Hollidays, Hollidays conspired to have the landlords obtain the PFC payments, and reduce the rent charged to them. Hollidays would indirectly benefit from the contract payments even though, because of the cap on payments, they could not have directly received them. The intent to defraud is critical to the United States's claim. So does timing. Timing of the agreements and the correlation of benefits may be important indicators of a fraudulent intent.

In the Damewood matter, Huls signed the PFC application in December 1997 for 1998. Although the 1998 lease on the farm is not dated, it is likely it was executed no later than March 1, 1998, when Hollidays made the first half rent payment (exhibit M-25). According to Schaaf's testimony, there would have been no wrongdoing in Hollidays negotiating the lower rent to compensate for the loss of the PFC payment, so long as Hollidays had not participated in a misrepresentation by Huls that Damewood intended to farm the ground in 1998.

Counsel for Hollidays implied at trial that unless there was evidence of when each Holliday reached his or her cap on PFC payments, one cannot know whether it was improper for Hollidays to negotiate for a lower lease payment based on the landlord's receipt of the PFC payment. I disagree that such timing alone can indicate whether there is a fraudulent agreement between the landlord and the tenant. A prospective tenant who had not

31

reached the cap, but who fully expected to on other leases, might
still knowingly participate in a fraud with a landlord who
executed a PFC with no intent to farm the ground.  Timing is only
one circumstance.  Considering all the evidence, I find
insufficient proof that Hollidays conspired in 1997 or 1998 to
obtain PFC payments indirectly as to the Martin farm by having
Damewood misrepresent her intent to farm in order to obtain the
PFC payment and then reduce the rent to Hollidays.  This is
especially so given the time between Damewood's signing up for
PFC on the land in 1997, and the reduction of any of the rents on
the farms leased to Hollidays.  Hollidays rented only the Martin
farm in 1998.  Damewood had received the PFC payment of
$3,548.00.  She reduced the rent on the farm for the 2001 crop
year by $9,300.65.  United States has failed to connect these
events.

<u>2. Quentin Anderson Farm</u>

United States makes the same allegation of fraud as to a
farm rented to Janet, Wendel, and Douglas in 1999 by Quentin
Anderson.  It alleges that Hollidays indirectly obtained PFC
monies in excess of their individual limits by conspiring with
the landlord to collect the payment and then reduce the rent to
them.  United States contends that the landlord had no intention
to farm and would not have been entitled to the PFC payment.

Wendel, Janet, and Douglas rented farm land in Ringgold
County from Anderson in 1998.  The amount of rent was $43,248.00
(exhibit K-4).  The lease provided that all government payments
on the acreage would go to tenants.

The three Holidays rented the same land from Anderson in
1999.  The lease was executed on an unspecified date in March
1999 (exhibit K-5).  The lease specified that all government
payments on the acreage would go to landlord.  The amount of the
lease payment was $38,438.00 (id.).  This was a reduction in rent
from 1998 of $4,810.00.  Anderson applied for a PFC with CCC on
March 3, 1999 (exhibit K-7).  He received a PFC payment for 1999
of $4,814.00.  In August 1999, Holidays succeeded Anderson as
the producers on the farm (exhibit K-8).

Anderson explained that one year Holidays were not able to
come up with the money to rent the farm.  He said he intended to
farm the land, and that he had purchased inputs, but at the last
moment Holidays came up with the money to rent.  He was not sure
if that was 1999.  Holidays delivered two checks to Anderson to
pay 1999 rent (exhibits K-11 and K-12).  The checks were dated
March 12, 1999, and they were negotiated by Anderson on March 15.
Other than the possibility of the last minute rental arrangement,
Anderson could not explain why the rent was reduced from 1998 to
1999 by $4,810.00.

Again because a tenant may negotiate for a reduction of rent
based on the landlord's having received the PFC payment, and
because Anderson testified that he had planned to farm the
ground, but agreed at the last minute to rent to Holidays, I
conclude that United States has not proven by a preponderance of
the evidence that Holidays participated in a scheme to defraud
the United States as to PFC payments on the Anderson farm.  I
reach this conclusion, despite concern over the close proximity

33

of Anderson's PFC application and the decision to rent to the
Hollidays, a period of no more than nine days.  It is also
troubling that Anderson could not explain why he reduced the rent
by very nearly the amount of his PFC payment.  If $43,248.00,
paid in 1998, was the fair rental value of the land, his
motivation to reduce the rent below that figure would be curious
if Hollidays did not qualify for the PFC payment.


### 3. Eric Rasmussen Farm

The third claim relating to PFC fraud involves landlord Eric
Rasmussen.  On April 13, 2000, Rasmussen signed a PFC application
for his farm identified as number 3706 (exhibit L-34).  He
represented himself as the owner/producer for 2000.  He was paid
$10,093.00 as the PFC payment.

The four Hollidays entered into a lease agreement with
Rasmussen, leasing 2,520 acres from him for ten years (exhibit L-
8).  The total annual rent was $201,600.00 (id.).  It appears
that the lease was executed by Hollidays on April 28, 2000, and
by Rasmussen and his spouse on May 1, 2000 (id.).  The lease
period began March 1, 2000.  It included farm 3706, for which
Rasmussen had received the 2000 PFC payment of $10,093.00.

In April, Hollidays presented two checks to Rasmussen.  Each
was for $57,050.00, and each purported to be for half the rent
(exhibits L-9 and L-10).  It appears that the checks were
processed by the National Bank in Lenox, Iowa on April 19, 2000
(id.).  United States contends that Hollidays presented the
checks to Rasmussen before they signed the lease.  Hollidays had

rented land from Rasmussen before 2000.  On June 21, 2000,

Hollidays signed the necessary documentation to succeed Rasmussen

on farm 3706, for purposes of programs other than the PFC.

United States argues that the timing of the transaction

makes it suspicious.  It points out that Hollidays had previously

rented the land, that Rasmussen applied for the PFC payment on

April 13, and he negotiated Hollidays' first-half rent check on

April 19.  United States concedes that it can point to no rent

reduction flowing to Hollidays, nor to any other benefit from

Rasmussens obtained from the PFC payment.

The timing of the events, without more, is insufficient for

the court to find that Hollidays and Rasmussen defrauded the

United States into paying PFC benefits to an owner who did not

intend to produce, in order for Hollidays to obtain some benefit

from the lessor.  I conclude that United States has failed to

prove fraud based on this lease transaction.


### 4.  Lucy Stauffer Farm

Lucy Stauffer lives in Chicago.  She is in her early to mid-

80s.  Stauffer owns farm land in Ringgold and Taylor counties.

In the late 1990s, she hired Lyle Craig Harris to act as her farm

manager.  Harris was responsible for finding tenants for the

farms.  He had Stauffer's power of attorney.

Since the late 1970s, Harris has been employed variously as

a farm manager, a farmer, a real estate appraiser and real estate

broker.  He has bachelor's and master's degrees from Iowa State

University.

As a broker, Harris sold Stauffer the farms in 1994, and he began managing them for her in 1997. Stauffer owned 450 acres in Ringgold County and 470 acres in Taylor County. The Ringgold County land is identified by CCC/FSA as farm number 2754. It contains 405.5 tillable acres.

When the existing tenant on the Ringgold County land concluded the tenancy, Harris sought a new tenant by advertising in a local newspaper. The previous tenant had paid annual rent of $24,000.00 or $25,000.00. He recalls getting 15 phone call inquiries, and six offers to rent. One of those interested in renting farm 2754 was Douglas Holliday. Harris recalls that he was contacted by Douglas, by telephone, in February 2000. All communications between them after the initial call were by telephone.

Harris testified that Douglas was interested in finding out what it would take to rent the farm; he wanted to know specifically what other offers had been made. The final offer by Douglas was $35,000.00. The next highest offer was $33,000.00.

After the conversation on total cash rent, Harris said that "Douglas proposed that the government payment be taken by Lucy, and then the balance between that amount and the $35,000.00 would be the amount that he would pay as the balance of the cash rent." Harris said the reference was to the production flexibility payment. Harris said that Douglas said they had done this in other counties on other occasions, and he wondered if they could do the same with the Stauffer lease. Harris said he had not previously been involved with PFCs. He said Douglas told him

that he needed to go into the FSA office to apply.

Harris went to the FSA office and executed a Production Flexibility Contract on Stauffer's behalf for farm 2754 on April 13, 2000 (exhibit J-11).  Stauffer received a PFC payment for farm 2754 in the amount of $9,559.00 (see exhibit J-13).

A written lease for the farm was prepared with the declared rent for 2000 being $25,441.00 (exhibit J-7).  Rent was required to be paid at the signing of the lease.  The lease was purported to have been signed May 15, 2000 (id.).  It appears that each of the four Hollidays signed the lease.  Harris signed on Stauffer's behalf.

Hollidays presented Harris with two checks as 2000 rent for the farm (exhibits J-9 and J-10).  They were dated April 15, 2000, and they appear to have been processed by a bank on April 24, 2000 (id.).  The checks totaled $25,441.00 (id.).  The difference between $35,000.00, which Harris said they initially agreed on, and the $25,441.00 as shown in the lease is $9,559.00, the same amount as the PFC payment to Stauffer.

Douglas said he had no idea that Harris had signed a PFC on the Stauffer farm.  He denies making the initial contact with Harris, testifying that Harris called him multiple times trying to get him to rent the farm (farm 2754).  Douglas said that eventually he said he would; he said Harris came up with the rental figure of $25,441.00, and Douglas said he agreed to Harris's demand.  He said he had no idea how he came up with that figure.

Douglas testified that in 2000, the farm was in disrepair.

He said there were weeds, ditches in disrepair, and there was rolling ground.  He said the Hollidays did a lot of work to put the property in good shape, including the installation of a crossing and culvert.  Because of the weed problem, Hollidays had to apply extra herbicide.  Douglas said all the extra work was done at Hollidays' expense.  On June 16, 2000, Douglas signed the paperwork with the CCC/FSA to have the Hollidays succeed as producers on the farm (exhibit J-12).

Douglas denies knowing anything about Stauffer's PFC or that Hollidays received any benefit from Harris because of it.  He denies that he suggested Stauffer apply for the PFC and reduce the rent by the amount of the PFC payment.

Hollidays and Stauffer (by Harris) entered into a lease for the farm for the 2001 and 2002 crop years (exhibit J-8).  The rent was $35,000.00 per year.  Douglas testified that he agreed to pay more rent for the next two years because the farm was in better shape, and rents were rising.

United States contends that Hollidays by fraud participated in a scheme to obtain the benefit of a PFC payment on the Stauffer farm, even though Hollidays were not eligible to receive such a benefit because each of the Hollidays' benefits were capped pursuant to 7 U.S.C. § 1308(1).

United States seeks to have its claim excepted from each Holliday's discharge under 11 U.S.C. § 523(a)(2)(A), which excepts a debt from a debtor's discharge to the extent a debtor obtained money by actual fraud.

Actual fraud consists of any deceit, artifice, trick or

design involving direct and active operation of the
mind, used to circumvent and cheat another--something
said, done, or omitted with the design of perpetrating
what is known to be a cheat or deception.

Fidelity Service Co. v. Grocki (In re Grocki), 147 B.R. 274, 277

(Bankr. S.D. Fla. 1992).  Actual fraud requires moral turpitude.

I find that Douglas acted fraudulently toward the United

States by initiating and taking part in a scheme to obtain,

indirectly, the benefits of a production flexibility contract on

the Stauffer farm, even though he would not have been entitled to

such direct benefits.

Douglas was aware of restrictions on Hollidays' benefits

under the PFC program because of the $40,000.00 cap per producer.

During 2000, Hollidays each reached the limit of such benefits.

I credit Harris's testimony, not Douglas's, regarding the

negotiations on the 2000 lease for Stauffer's farm 2754.  The two

men had negotiated and agreed on $35,000.00 for the farm for

2000.  Douglas suggested that Stauffer apply for PFC benefits.

Douglas was sufficiently versed in such benefits to know that a

cash-rent landlord who was not a producer of a crop could not

qualify.  But I find that he also knew that an owner could

represent that he or she intended to be a producer, obtain a

payment, and change his or her mind.  He was well aware of how to

file succession documents with CCC/FSA.  He had done so many

times.

Douglas knew when he reached agreement with Harris on the

$35,000.00 rental that Hollidays did not qualify for a PFC on the

farm.  He knew also that Stauffer would not.  Yet he suggested to

39

Harris that Stauffer apply, obtain the benefit, and reduce the rent accordingly, and this is exactly what took place.  Douglas's fraud was knowing and intentional.  According to the evidence on the program, and the circumstances of Hollidays and Stauffer, neither qualified for a PFC on the farm.  Douglas's suggestion to Harris was an effort for Hollidays to obtain the benefit of the PFC without qualifying.  It defrauded $9,559.00 from the United States.  I find the United States justifiably relied on the application of Stauffer in paying the PFC payment to her.  Harris carried out the scheme, and Hollidays took full and knowing advantage of it, receiving the requested *pro tanto* reduction in rent.  I believe it is irrelevant whether Harris understood the import of what he was doing or whether he did not.  If he did, he was an active participant in the fraud.  If he did not, he was Douglas's unknowing dupe.

United States's claim against Douglas for fraud regarding the Stauffer Production Flexibility Contract should be excepted from Douglas's discharge under 11 U.S.C. § 523(a)(2)(A).  The claim will be excepted from Douglas's discharge to the extent of $9,559.00.

The court must decide whether Douglas's fraud may be imputed to Jodie, Janet, and Wendel, Douglas's partners or joint venturers.  There are different views on this legal issue.

In Strang v. Bradner, 114 U.S. 555, 5 S.Ct. 1038, 29 L.Ed. 248 (1885), the Supreme Court determined that for the purposes of dischargeability of debt under the Bankruptcy Act of 1867, a partner's fraud could be imputed to a partner who had no

40

knowledge of the fraud.  114 U.S. at 561.

The Fifth Circuit in <u>Luce v. First Equipment Leasing Corp.</u>
<u>(Matter of Luce)</u>, 960 F.2d 1277 (5th Cir. 1992), followed the
<u>Strang</u> decision where the fraudulent actor and the debtor were
partners, the actor was acting in the ordinary course of the
business, and the debtor benefitted monetarily from the fraud.
960 F.2d at 1283.  Such reasoning was followed by the Sixth
Circuit in <u>BancBoston Mortgage Corp. v. Ledford (In re Ledford)</u>,
970 F.2d 1556, 1561 (6th Cir. 1992).

Our circuit court has determined that, in the context of
dischargeability under § 523(a)(2)(A), a principal should be
charged with an agent's fraud only if the principal knew or
should have known of the fraudulent conduct.

> [W]e agree with the district court that more than the
> mere existence of an agent-principal relationship is
> required to charge the agent's fraud to the principal.
> However, as indicated, actual participation in the
> fraud by the principal is not always required.  If the
> principal either knew or should have known of the
> agent's fraud, the agent's fraud will be imputed to the
> debtor-principal.  When the principal is recklessly
> indifferent to his agent's acts, it can be inferred
> that the principal should have known of the fraud.

<u>Walker v. Citizens State Bank of Maryville, Missouri (In re</u>
<u>Walker)</u>, 726 F.2d 452, 454 (8th Cir. 1984).

In arranging for the lease terms with Harris for the
Stauffer farm, Douglas was acting for all the Hollidays and was
acting within the scope of the business.  All of the Hollidays
benefitted monetarily from the fraud.  The question therefore is,
did Wendel, Janet, or Jodie know of the fraud, or should they
have known.  Certainly they ceded to Douglas most of the

responsibilities for negotiating and maintaining leases.

Jodie testified that she knew that Stauffer was a landlord. However, she said she did not know that Stauffer was receiving production flexibility contract payments.  The evidence submitted by United States often showed that Jodie did not know a great deal about the families' farming/business affairs.  She deferred to Douglas on most decision making and often also to Wendel.  She did sign the Stauffer lease in 2000, and I find nothing in it that would have alerted Jodie to the fraud.

As to Janet and Wendel, I find no evidence in their deposition testimonies that they knew of the fraud on the Stauffer lease.  They also signed the lease document, and likewise, as with Jodie, I find nothing in the lease that would have alerted them that the transaction perpetrated a fraud on the United States.

I conclude that United States has failed to prove by preponderance of the evidence that Wendel, Janet, or Jodie knew or should have known of the fraud regarding the Stauffer lease and production flexibility contract.  United States's claim against them will be dismissed.


## D. Scheme or Device

Prior to trial, United States asked the court to stay proceedings to permit the Secretary of Agriculture to determine, through administrative proceedings, whether Hollidays had engaged in a scheme or device within the meaning of 7 U.S.C. § 1308-2 and 7 C.F.R. § 1412.405 (1998).  United States contended that the

Secretary had primary jurisdiction to make such a determination.

Absent bankruptcy, if the Secretary makes a determination

>that any person has adopted a scheme or device to
>evade, or that has the purpose of evading, section
>1308, 1308-1, or 1308-3 of this title, such person
>shall be ineligible to receive farm program payments
>(as described in subsections (b), (c), and (d) of
>section 1308 of this title as being subject to
>limitation) applicable to the crop year for which
>such scheme or device was adopted and the succeeding
>crop year.

7 U.S.C. § 1308-2 (2002).

As to "scheme or device," the Code of Federal Regulations in

1998 provided the following:

>§ 1412.405 Misrepresentation and scheme or device.

>(a) A producer who is determined to have
>erroneously represented any fact affecting a program
>determination made in accordance with this part
>shall not be entitled to contract payments and must
>refund all payments, plus interest determined in
>accordance with part 1403 of this chapter.

>(b) A producer who is determined to have
>knowingly:

>(1) Adopted any scheme or device that tends to
>defeat the purpose of the program;

>(2) Made any fraudulent representation; or

>(3) Misrepresented any fact affecting a
>program determination shall refund to CCC all
>payments, plus interest determined in accordance
>with part 1403 of this chapter received by such
>producer with respect to all contracts.  The
>producer's interest in all contracts shall be
>terminated.

7 C.F.R. § 1412.405 (1998).

Ineligibility, as a result of adopting such scheme or

device, extends to payment received under various farm programs.

The programs for which the person becomes ineligible are not

limited to the programs which were the subject of the scheme or
device.  Also, ineligibility is not limited to the crop year in
which the scheme or device was adopted, but also extends to the
following crop year.  7 U.S.C. § 1308-2.

A producer who knowingly adopts a scheme or device "that
tends to defeat the purpose of the program," or who made any
fraudulent representation, or who misrepresented a fact affecting
a program determination, must refund to CCC all payments plus
interest received by the producer "with respect to all
contracts."  7 C.F.R. § 1412.405(b)(1)-(3) (1998).  The
producer's interest in all such contracts shall be terminated.
(Id.)

Shortly before trial, United States moved the court to
bifurcate the proceedings to defer to the Secretary's rights to
make the "scheme or device" determination through the Secretary's
administrative process.  United States requested that the court
issue its findings and conclusions on this issue of fraud, and if
the court determined that there had been fraud, permit the
Secretary to make eligibility and resulting overpayment
determinations.  Upon a final agency determination as to required
refunds to CCC, the matter would be returned to the bankruptcy
court for final determination of dischargeability of any refund
requirements (United States Motion to Bifurcate, docket nos. 56).

The court denied the motion to stay proceedings and
indicated that it would determine claims of actual fraud and
damages.  The United States would not be required at trial to
prove the amount of all contract payments that would be recovered

if there were a scheme or device, but only those damages directly resulting from fraud.  The court ruled that it would issue a further order on whether there would be additional proceedings if it were determined that the United States had been defrauded.

The court has now determined that the United States is entitled to judgment on its claim against Douglas Holliday arising from fraud on the execution and payment of a Production Flexibility Contract to Lucy Stauffer on farm 2754.  The claim is determined to be excepted from Douglas Holliday's discharge under 11 U.S.C. § 523(a)(2)(A) to the extent of $9,559.00.

United States appears to contend that the Secretary, through the administrative process, could find that the fraud constituted a "scheme or device" under 7 U.S.C. § 1308-2, and demand a refund of all program payments made to Douglas in 2000 and 2001.  It asks leave to make such a determination.

The request will be denied.  Absent bankruptcy, the Secretary may be able to demand and obtain a refund of all program payments from a producer who knowingly adopts a scheme or device that tends to defeat a program or who makes knowing misrepresentations or fraudulent representations.

However, bankruptcy intervened in these circumstances before the Secretary could make such a determination.  Without bankruptcy, United States may be entitled to a refund of program payments unrelated to the fraudulent conduct.

This court is charged with determining what claims are excepted from discharge because money was obtained by fraud.  11 U.S.C. § 523(a)(2)(A).  It has sole jurisdiction to make the

determination.  "To the extent" that money was obtained from

United States by fraud, its claim may be excepted from Douglas's

discharge.  I have found that the United States's claim against

Douglas for $9,559.00 was obtained by fraud.  That claim will be

excepted from his discharge.  The United States may have a claim

against him for other payments received by him, but not as a

proximate result of the fraud.  These claims are discharged in

bankruptcy.  I conclude there is no requirement that I bifurcate

the proceedings to permit the Secretary to determine the amount

of all refunds that may be provided by the statute and

regulations.

IT IS ORDERED that judgment shall enter that United States's

claims against Jodie Holliday, Janet Holliday, and Wendel

Holliday are dismissed with prejudice.

IT IS FURTHER ORDERED that judgment shall enter that the

claim of United States against Douglas Holliday in the amount of

$9,559.00 is excepted from his discharge under 11 U.S.C. §

523(a)(2)(A).

DATED AND ENTERED   August 7, 2007

William L. Edmonds, Bankruptcy Judge

46